## ORDER OF RAILROAD TELEGRAPHERS et al. v. NEW ORLEANS, T. & M. RY. CO. et al.

### No. 2606.

District Court, E. D. Missouri, E. D.
July 10, 1945.

R. Walston Chubb, of St. Louis, Mo. (Lewis, Rice, Tucker, Allen & Chubb, of St. Louis, Mo., and Ralph E. Kennedy, of Springfield, Mo., of counsel), for plaintiffs.

Thos. T. Railey and H. H. Larimore, both of St. Louis, Mo., for defendant carriers.

Clarence T. Case, of St. Louis, Mo., Frank L. Mulholland, Clarence M. Mulholland, and Willard H. McEwen, all of Toledo, Ohio, and James L. Crawford, of Cincinnati, Ohio, for defendant Brotherhood of Railway and Steamship Clerks, Freight Handlers, Express and Station Employes.

HULEN, District Judge.

This case primarily involves a contest between two railroad labor unions. Plaintiffs, comprising the Order of Railroad Telegraphers,[1] and certain of its officials and members, acting as representatives of all in a similar class, seek a declaratory judgment voiding a certain contract between the defendants, Brotherhood of Railway and Steamship Clerks, Freight Handlers, Express and Station Employees,[2] and defendant carriers, insofar as the contract purports to control clerical work of the carriers now being performed by the O. R.T. Injunctive relief against defendants

---

[1] Herein referred to as "O.R.T." or "Telegraphers' Union."

[2] Herein referred to as "B.R.C." or "Clerks' Union."

in accord with the contract interpretations is also prayed for. The contract thus in issue we refer to as the "Memorandum Agreement." Count Two prays for injunctive relief against the enforcement of certain awards of the National Railroad Adjustment Board, in favor of the defendant B.R.C. and against defendant carriers, which were based on the "Memorandum Agreement."

Plaintiffs' complaint, under Count One, in brief, is based upon a claim that the enforcement of the "Memorandum Agreement" involves an interference with plaintiffs' employment and working conditions and threatens irreparable injury to their craft, contrary to the provisions of the Railway Labor Act, 45 U.S.C.A. § 151 et seq. Count Two seeks to enjoin the enforcement of certain awards of the Railroad Adjustment Board because plaintiffs O.R.T. were not permitted to intervene in the proceedings and for alleged irregularities in the proceedings of the Board leading up to making the awards. Defendants B.R.C. challenge the jurisdiction of the Court on each count of the complaint, and also defend on the grounds, (1) the "Memorandum Agreement" violates no right of the plaintiffs O.R.T.; (2) a decision by arbitration under the Railway Labor Act has been made; and (3) a ruling of the American Federation of Labor has settled the issue. The carrier defendants join with defendants B.R.C. in pleas to the jurisdiction of the Court under Count One, and join with plaintiffs O.R.T. under Count Two, in their attack on the orders of the Railroad Adjustment Board.

The controversy between the plaintiff and defendant unions is not of recent origin.[3] For many years there have been complaints by the Clerks' Union that work properly coming within the scope rules of their contract was being assigned by the carriers to telegraphers, members of plaintiff union. This issue became acute during the depression, when, as a result of decrease in business, the carriers retrenched in personnel. Time has widened the breach. To effect economies, in many cases the carriers reduced station forces. The Clerks' Union claim this was done by laying off clerks, members of the B.R.C., and causing work previously done by such employees to be taken over by telegraphers, members of the O.R.T. It is charged that in some cases, when the station forces were again enlarged, members of plaintiff union were recalled and assigned clerical work instead of members of the defendant union. Each of the unions had collective bargaining contracts with the carriers. These contracts included scope rules, which undertook to define the rights of employees, including work and jobs covered by the agreement between the carrier and the union. It is not claimed by the plaintiff that its collective bargaining contract in express terms sets forth the character of work to be performed by its members, but the plaintiff asserts the character of work covered has been established to include some clerical work by custom and practice of the carriers over many years. The contract with B.R.C. sets out in the scope rules positions that are covered and places all clerical work under the agreement, subject to certain exceptions and conditions.

The Clerks' Union complained in 1932, as a result of the practice of the carriers in assigning clerical work to members of the Telegraphers' Union. At that time it presented a number of claims against the carriers, based upon its collective bargaining contract, resulting from a charge that the carriers were displacing members of its union, and assigning their work to members of the plaintiff union. At that

[3] In Chapter 7, page 332, "Railroads," of How Collective Bargaining Works, survey published by the Twentieth Century Fund, 1942, on "Jurisdiction," the author states:

"Few railroad labor organizations have the degree of craft purity commonly ascribed to them. The extension of unionism to new areas, the blurring of craft lines as a result of technological change, and the decline in jobs and in the number of actual and potential members have caused many organizations to claim jurisdiction over groups already claimed by others. Consequently, jurisdictional disputes are common. Although the shop crafts occasionally quarrel among themselves, they have been able on the whole to limit their jurisdictions and maintain craft lines.

"The clerks and telegraphers, on the other hand, are really amalgamated unions, having absorbed one group after another as they developed. A particularly troublesome area, complicated by promotion and seniority rules, lies within the jurisdiction of the transportation brotherhoods. Amalgamation efforts have failed, and there seems little likelihood of success in the near future, although such action would undoubtedly clear up many problems."

time the provisions for the Adjustment Board of the Railway Labor Act were not in effect. The amendment to the Railway Labor Act was passed in 1934, "to provide for the prompt and orderly settlement of all disputes concerning rates of pay, rules, or working conditions; * * * to provide for the prompt and orderly settlement of all disputes growing out of grievances or out of the interpretation or application of agreements covering rates of pay, rules, or working conditions," U.S.C.A. Title 45, Section 151a, etc. *between carriers and their employees.* The first cases to come before the Adjustment Board provided by the Act, U.S.C.A. Title 45, Section 153, filed by the defendant B. R. C., were decided in June, 1937, being awards Nos. 450, 451, and 452. Reference to the award in one of these cases will disclose the issue that is fundamental between the plaintiff and defendant unions in this case. In Award No. 451, defendant B.R.C. claimed that the carriers were violating their collective bargaining agreement by assigning clerical work to employees not covered by the agreement, at Weslaco, Texas. As disclosed by the award, in 1929 there were three clerical positions at Weslaco. Two of these positions were abolished in 1930. In 1935, the force at Weslaco consisted of two telegraphers and one cashier, and when it became necessary to increase the force, two additional telegraphers were added, making four telegraphers' positions and one clerical position. The position of the carriers in Award No. 451 was that:

"The three telegrapher clerks assigned at the above mentioned point are properly classified as coming under the telegraphers' agreement, and employees listed as coming under the purview of the telegraphers' agreement were assigned. We have an agreement with the O.R.T. that telegraphers may be required in addition to their telegraphic duties, to perform clerical service."

The Referee's (U.S.C.A. Title 45, Section 153(2) opinion in Award No. 451 sustained the position of the Clerks, with this observation as to the conflict of the two unions under their contracts:

"We do not overlook the hardship that may be imposed upon the carrier because of the effect of the Agreement with another Brotherhood such as the Order of Railroad Telegraphers. There is no doubt that in many cases requirements of Agreements with different Brotherhoods impose upon a carrier certain hardships in particular instances where there is not enough work to employ full time men under each Agreement. However, this is a matter that cannot be solved by violating one agreement in order to abide by another. The solution lies rather in proper conferences and agreements with the respective brotherhoods. Such conferences should be held with a view of reaching an amicable and reasonable result which would impose no hardship upon either side. It is, however, not within the province of this Board to uphold one such agreement and at the same time strike down the other. When such Agreements are fairly made this Board can but construe them. We cannot excuse the violation of the terms of one agreement by invoking the terms of another.

"Such agreements are analogous to separate contracts and the parties themselves must adjust the hardships resulting from overlapping.

"We have no alternative but to sustain claim of the employes."

There was testimony in this case that Awards Nos. 450, 451 and 452 were compromised by the carriers, and the settlement put into effect.

The Clerks' Union, at its convention in 1939, adopted a resolution seeking the appointment by the Telegraphers' Union of a jurisdictional committee to meet with a like committee of the Clerks' Union, for the purpose of settling the jurisdictional dispute between the two unions, regarding the performance of clerical work and the claims of the two unions to the performance of such work under their contracts.[4]

---

[4] The resolution read as follows:

"That this Convention authorize and instruct the Grand President to appoint a committee of five members, to be known as a Special Jurisdictional Committee, to consider, and, if possible, dispose of any and all jurisdictional matters existing between our organization and the Order of Railroad Telegraphers; and be it further

"Resolved, that a copy of this resolution be immediately dispatched to the Order of Railroad Telegraphers now in convention in Milwaukee, Wisconsin, with the suggestion and hope that they will take similar action, appointing a like committee similarly empowered, so that the full intent and purpose of this resolution may be carried out through joint conferences of such committees."

Although committees were appointed by both unions, and conferences held, no agreement was reached on the "jurisdictional" dispute.

In 1940 the B.R.C. initiated proceedings to change the existing collective bargaining agreement with the carriers, and in the course of the proceedings leading up to the 1940 agreements, including the "Memorandum Agreement" here in issue, a strike ballot was circulated by the Clerks' Union, with the result that the carriers invoked the services of the National Mediation Board. U.S.C.A., Title 45, Section 152, Ninth. The Mediation Board's services resulted, or at least aided, in three agreements being executed by the carriers and defendant B.R.C., on October 14, 1940. These included a new collective bargaining agreement and the "Memorandum Agreement" [5] under attack in this case. The third agreement withdrew all matters from mediation. Soon after the execution of the "Memorandum Agreement," the B.R.C. alleged that the carriers were violating its terms, with the result that claims were filed with the Railroad Adjustment Board under the terms of the Act. Awards Nos. 2253 to 2258, inclusive, resulted. Claims of the B.R.C. were sustained in these awards. Plaintiffs seek their annulment by the second count of the complaint. These awards have never been put into effect by the carriers, nor has any action been taken to enforce the awards, which requires an action in the United States District Court. U.S.C.A., Title 45, Section 153, First (p). The record in this case also shows further parallel proceedings between defendant Clerks' Union and defendant carriers, to settle the claims of the Clerks that members of the Telegraphers' Union were being assigned work properly belonging to the Clerks under the "Memorandum Agreement." Arbitration provision of the Railway Labor Act, U.S.C.A., Title 45, Section 155, First (b), was invoked. It came about as a result of the carriers, in 1943, taking steps to abrogate the "Memorandum Agreement." The Clerks' Union took similar action to change certain rules of its existing collective bargaining agreement. The parties were unable to agree. The services of the National Mediation Board having failed to settle the dispute, the parties agreed on arbitration. The arbitrators' decision was to the effect that the "Memorandum Agree-

---

[5] Copy of the "Memorandum Agreement" follows:

"Memorandum Agreement
between
Gulf Coast Lines
International-Great Northern Railroad Co.
San Antonio, Uvalde & Gulf Railroad Co.
Sugarland Railway Company
Asherton & Gulf Railway Co.
and
Brotherhood of Railway and Steamship Clerks, Freight Handlers, Express and Station Employes.

"(a) It is recognized and agreed that all of the work referred to in Rule 1 of the Agreement dated November 1, 1940, between the Carrier and the Brotherhood belongs to and will be assigned to employes holding seniority rights and working under the Clerks' Agreement, except as provided below:

"(b) Due to the peculiar conditions existing in station service it is agreed that:

"(1) Where an Agent covered by an agreement other than the Clerks' Agreement is the only employe on duty not covered by the Clerks' Agreement the Carrier may assign such Agent any work covered by the Clerks' Agreement.

"(2) At stations where two employes not covered by the Clerks' agreement are on duty at the same time and the work covered by the Clerks' Agreement is less than five hours the Carrier may assign such work to those two positions.

"(3) In all instances other than those set out in Items (1) and (2) above, it is agreed that where the work covered by the Clerks' Agreement is less than three hours on any shift of eight hours the Carrier may assign such work to station employes not covered by the Clerks' Agreement.

"(c) It is further understood and agreed that work accruing on one shift will not be held over to be performed on another shift.

"(d) It is further understood and agreed that employes holding rights and working under the Clerks' Agreement have the right and will be permitted to use the telephone in the handling of business connected with their work.

"This Agreement shall be effective November 1, 1940, and shall continue in effect one year, and thereafter until it is changed as provided herein or under the provisions of the Railway Labor Act.

"Should either of the parties to this Agreement desire to revise or modify these rules, thirty (30) days written advance notice, containing the proposed changes, shall be given and conference shall be held immediately on the expiration of said notice unless another date is mutually agreed upon."

ment" should remain in effect. This award was filed in the United States District Court for the Southern District of Texas. The record does not show a formal judgment entry confirming it (Stipulation, paragraphs 21, 22).

Nor does this complete the record of attempts to settle the dispute between plaintiff Telegraphers' Union and defendant Clerks' Union. The Clerks' Union in April, 1944, submitted their jurisdictional controversy to the Executive Council of the American Federation of Labor. The submission reads as follows:

"Cincinnati, O.
"April 29, 1944.

"Mr. Wm. Green, Pres.
   "American Federation of Labor,
   "Adelphia Hotel,
   "Philadelphia, Pa.

"Dear Sir and Brother:

"For some time the Order of Railroad Telegraphers representatives have been making deals with various railroad management officials to take over office clerical work, freight handling, etc. properly belonging to our members. During the depression when jobs were scarce this outfit persuaded railroad officials to discontinue the jobs of our men and they took over our work, thereby assuring continuation of employment for their members.

"We have conferred with President V. O. Gardner and other officers of the Order of Railroad Telegraphers in protest against these activities and endeavored to persuade them to cease these activities, but the difficulties grow worse. Recently we fought out the matter with one of the railroads but could not get an adjustment, whereupon we appealed to the National Railroad Adjustment Board, established under the Railway Labor Act for settlement of grievance disputes arising from collective bargaining agreement violation. The Board decided six cases in our favor. The railroad company, while not refusing to apply the decisions, never put the decisions into effect.

"About two weeks ago President Gardner, Order of Railroad Telegraphers, filed suit in the District Court of the United States, Eastern Division, Eastern Judicial District of Missouri, requesting an injunction to restrain our Brotherhood from taking any action to enforce these decisions, and to restrain the railroad company from putting the decisions into effect. They also asked that we be enjoined from taking any other action to recover our work. This is regretable and indefensible.

"I formally request the Executive Council to denounce the bringing of this injunction suit, and I hereby formally file with you complaint accusing the Order of Railroad Telegraphers of invading our work jurisdiction and requesting that officers of the Order of Railroad Telegraphers be notified to appear before the Executive Council to answer this complaint upon some date satisfactory to the Executive Council. I hope opportunity can be found to consider this request and dispose of same at the meeting of the Executive Council to be held in Philadelphia, Pa. commencing May 1st.

"Sincerely and fraternally,
         "Geo. M. Harrison,
            "Grand President."

After hearing, the Executive Council of the American Federation of Labor issued a decision in May, 1944, sustaining the position of the defendant B.R.C. Because it reflects the basis of the issue between the two unions that is here involved, we quote that decision in full:

"This case came on for hearing and decision through complaint filed by the Brotherhood of Railway Clerks, April 29th, 1944, against The Order of Railroad Telegraphers, alleging that the telegraphers have been and are now invading and transgressing the work jurisdiction of said Brotherhood. The Order of Railroad Telegraphers was chartered by the American Federation of Labor October 31, 1899, and new charter was issued September 18, 1901, and thereupon admitted to affiliation as an International Labor Union of railroad employees engaged in transmission of intelligence by Morse Code through wires. In the year 1913, said ORT applied to the A. F. of L. for extension of jurisdiction to include the clerical work and this request was denied in the year 1914. No extension of jurisdiction has been granted since date of affiliation.

"The Brotherhood of Railway Clerks was admitted to the A. F. of L. in 1907 as an International Labor Union of Railroad and Steamship clerks employed by railroads, steamships and other transportation companies. On application, jurisdiction was extended to include freight handlers employed by railroads.

"At the hearing of their complaint by the Executive Council, the Brotherhood alleged that the members of the ORT have

been and are now making records, bills, accounts, assessing and collecting charges, for the transportation of property and selling tickets and other clerical work for the transportation of persons.

"In many instances members of the ORT devote substantially their entire work day to clerical work and only one hour or less to telegraphers' work. It was shown by the Brotherhood that the ORT had admitted to membership employees of railroads who devote their entire working day to clerical work such as selling passenger tickets, receiving deliveries, billing, rating and collecting charges and making of other records for the transportation of property.

"The ORT admitted its members have been and are now doing clerical work as claimed by the Brotherhood, but undertook to defend this conduct by pointing out that this has been done for many years to a varying extent and that clerical work is a part of their jurisdiction. It was claimed that unless members of the ORT are permitted to do clerical work their jobs as telegraphers will in many instances be discontinued because there is no need for their services as telegraphers. The ORT admitted some of its members are exclusively employed doing clerical work and they do have in membership clerks employed by the railroads in the United States and Canada.

"The facts are clear that the Brotherhood was granted jurisdiction over all railroad clerical work of the character above described and that the ORT has invaded the work jurisdiction of the said Brotherhood granted by the American Federation of Labor. Their violation of clerks jurisdiction by the ORT cannot be excused because it has continued for some time. The very purpose of the A. F. of L. in granting work jurisdiction to International Unions would be defeated if their contention were accepted. It would breed non-respect for the rights of affiliation and induce industrial conflict that will inevitably result in work interception.

"The Executive Council finds that the ORT is violating the jurisdiction of the Brotherhood of Railway Clerks, et al and instructs said ORT to confine its members to the work jurisdiction granted by the A. F. of L., and directs that any member of the ORT performing clerical work be disassociated from membership."

This decision was reviewed by the Committee of Adjustments at the next convention of the A. F. of L., and this Committee recommended that the decision of the Executive Council be sustained,. with minor changes. This action was approved by the Convention (Stipulation, par. 29).

█ The position of the plaintiff union, representing telegraphers, remains unchanged, as shown by the proceeding above referred to. It is here asserting that if the "Memorandum Agreement" is carried into effect, it will deprive telegraphers of work now performed by them, and under practices and customs of the carriers it will deprive them of work that has traditionally been performed by them, and to which, under their contracts with the carriers, they claim a prior right over the Clerks' Union. Without discussing in detail the scope rules in the contract between the carriers and plaintiff O.R.T., on the one hand, and carriers and defendant B.R. C., on the other, it is sufficient to state, in view of the conclusions we have reached, that both unions claim their contract with the carriers should be interpreted to include the clerical work that has been the subject matter of the controversy over a period of many years. The jurisdictional lines of the two unions as viewed by the unions, results in their being indefinite, not determined, if, in fact, they do not overlap. Thus far the plaintiff Telegraphers have been more successful than defendant Clerks in securing recognition of their claims from the carriers. As the Telegraphers, with consent of the carriers, push out the borders of their jurisdiction in the interests of work for their members, they inevitably conflict with jobs of members of the defendant Clerks' Union, who thereby find themselves displaced by members of the plaintiff union. And as the Clerks' Union resists this encroachment, plaintiff Telegraphers charge that the clerks are forcing the carriers to violate the work or scope rules and their jurisdictional limits as fixed by the Telegraphers' agreement with the carriers. The record as thus made in this case is in conformity with the issues stated in the pleadings. These allegations in the complaint define the issue. As to the scope of work of the plaintiff O.R.T., the complaint alleges:

" * * * that the scope of the work of agents, telegraphers, and telegrapher clerks and the like has been recognized for more than thirty years prior to and since the administration of the railroads during World War I under the Director General of Railroads, as including clerical work."

Referring to the position of the defendant B.R.C. prior to the effective date of the "Memorandum Agreement," the complaint states that defendant B.R.C. "contended and demanded in the state of Texas that its said scope rules conferred upon employees of *the craft and class represented by B.R.C.* the exclusive right to perform clerical work and that the definition of 'clerk' contained *in its scope rule* applied not only to the craft and class recognized as represented by the said B.R.C. but also *applied to other classes and crafts* not party to the said agreements, in that said Clerks' Agreement entitled the classes and crafts represented by the said B.R.C. to do all clerical work (with certain granted exceptions) *to the exclusion of other classes and crafts and particularly the classes and crafts represented by the O.R.T."* (Emphasis added)

Referring to the effect of the "Memorandum Agreement" and its place in plaintiff's cause of action, the complaint states the following:

"The said memorandum agreement has been made the basis of *claims by B.R.C.* to the exclusive right to perform clerical duties on the lines of the defendant railroads, *to the exclusion of members of the O.R.T.* engaged in such work, contrary to the provisions of said telegraphers' agreement as the same has been in force and applied for many years next, past, and in violation of the contract rights of members of the O.R.T. as hereinabove set forth." (Emphasis added.)

The complaint alleges that the "Memorandum Agreement" between defendant B.R.C. and the defendant railroads was made following, and as a result of, certain strike threats of the B.R.C., and that the defendant B.R.C. in insisting upon the negotiation of the "Memorandum Agreement" intended to induce breach of the contract of defendant railroads made with employees of the craft represented by plaintiff O.R.T.— "and further that said demands and threats inaugurate a course which *has* or will create jurisdictional disputes and industrial strife between classes and crafts involved and represented by the O.R.T. and the B.R.C. respectively and in conflict with the public purposes announced in the Railroad Act; that said memorandum agreement constitutes an illegal departure from the practice, procedure and modes of collective bargaining in the railroad industry *between* the classes

and crafts of railroad employees and carriers in that it *constitutes an invasion of one class or craft of the field of employment of another class or craft."* (Emphasis added)

Referring to the Railway Labor Act, and its effect upon the attempt of the defendant B.R.C. to enforce the terms of the "Memorandum Agreement," the complaint states:

"* * * that the bargaining scope of the said B.R.C. is limited by said act solely to the rates of pay, rules and working conditions of the class or craft for which it is the recognized and certified representative; that said Railway Labor Act, in Sections One and Two thereof, adopts the policy that collective bargaining shall be carried on by the representative of classes and crafts of employees; that while said Railway Labor Act disclaims and prohibits any administrative or statutory definition of the jurisdiction of the respective classes and crafts, it will nevertheless obstruct and impede collective bargaining established and promoted by the Act *to permit one class or craft, as above recited, to invade the recognized functions or appropriate the work* which other classes and crafts have customarily performed."

We have stated in some detail, not only the history of the controversy submitted to this Court in this action, but the interpretation placed on that controversy by the plaintiffs, because in our judgment it leads to but one conclusion, that Count One of the complaint pleads a jurisdictional dispute between two railroad unions, and the record confirms the cause as pled. To determine this issue, what is necessary? A finding must be made as to the extent of the jurisdiction of the Telegraphers' Union over clerical work, under its collective bargaining agreement with the carriers, and a like finding as to the extent of the jurisdiction of the defendant Clerks' Union over clerical work, under its collective bargaining agreement with the carriers. Manifestly they over-lap. Can the respective domains of two over-lapping unions or crafts be litigated and decided in this character of action in a Federal Court? We think the question thus presented is governed by the decision of the Supreme Court in the case of General Committee v. Missouri K. T. R. Co., 320 U.S. 323, 64 S.Ct. 146, 88 L.Ed. 76. The Missouri K. & T. case presents a state of facts strikingly similar to those presented by the

record in this case. It was a contest between the Engineers' Union and the Firemen's Union. The litigation arose over the practice of railroads promoting firemen to the position of engineers. When the business of the railroad became slack, the engineers were demoted to firemen instead of being laid off, resulting in a corresponding number of firemen being forced out of service. There was a longstanding controversy between the firemen's union and the engineers' union over the situation presented. They were unable to settle their differences. The firemen's union made an agreement with the railroad governing the handling of the working list of engineers. This agreement was the basis of the litigation. The agreement was made as a result of mediation proceedings conducted by the National Mediation Board under the Railway Labor Act. The Engineers brought suit to have the agreement declared void as in violation of the Railway Labor Act. The similarity between the litigation in the Missouri K. & T. case of the firemen and engineers and the clerks and telegraphers in the present case is apparent. The dispute, in each case, arose out of conditions of employment resulting because two unions were trying to preserve work for their members and prevent termination of employment to the disadvantage of members of the other union. In each case the carrier entered into an agreement with one organization, the effect of which was adverse to the other union. The agreement which the Court was asked to nullify in each case was made as a result of the efforts of the National Mediation Board. In holding that the issues presented a jurisdictional dispute not within the power of the Court to determine, the Supreme Court said (320 U.S. 323, loc.cit. 334, 64 S.Ct. 146, 151, 88 L.Ed. 76):

"It is true that the present controversy grows out of an application of the principles of collective bargaining and majority rule. *It involves a jurisdictional dispute— an asserted overlapping of the interests of two crafts. It necessitates a determination of the point where the authority of one craft ends and the other begins or of the zones where they have joint authority.* In the Clerks case and in the Virginian Ry. Co. case the Court was asked to enforce statutory commands which were explicit and unequivocal. But the situation here is different. Congress did not attempt to make any codification of rules governing these jurisdictional controversies. It did not undertake a statement of the various principles of agency which were to govern the solution of disputes arising from an overlapping of the interests of two or more crafts. It established the general principles of collective bargaining and applied a command or prohibition enforcible by judicial decree to only some of its phases. * * * *It is pointed out that if the jurisdiction of a craft within which the exclusive right may be exercised is not limited, then disputes between unions may defeat the express purposes of the Act.* In that connection reference is made to the statement of this Court in the Virginian Ry. Co. case, 300 U.S. [515] 548, 57 S.Ct. [592], 81 L.Ed. 789, that the Act imposes upon the carrier 'the affirmative duty to treat only with the true representative, and hence the negative duty to treat with no other.' That expresses the basic philosophy of § 2, Ninth. But the decision does not imply, as is argued here, that every representation problem arising under the Act presents a justiciable controversy. *It does not suggest that the respective domains for two or more overlapping crafts should be litigated in the federal district courts."* (Emphasis added)

In plain and unmistakable language the Supreme Court in the above case takes the settlement of disputes of the character presented by the record in this case from the class of controversies justiciable in the United States District Court:

"*It seems to us plain that when Congress came to the question of these jurisdictional disputes, it chose not to leave their solution to the courts.* As we have already pointed out, Congress left the present problems far back in the penumbra of those few principles which it codified. Moreover, it selected different machinery for their solution. Congress did not leave the problem of inter-union disputes untouched. It is clear from the legislative history of § 2, Ninth, that it was designed not only to help free the unions from the influence, coercion and control of the carriers but also to resolve a wide range of jurisdictional disputes between unions or between groups of employees. H. Rep. No. 1944, supra, p. 2; S. Rep. No. 1065, 73d Cong., 2d Sess., p. 3. *However wide may be the range of jurisdictional disputes embraced within § 2, Ninth, Congress did not select the courts to resolve them."* (Emphasis added)

See also General Committee v. Southern Pac. Co., 320 U.S. 338, 64 S.Ct. 142, 88 L.Ed. 85.

Plaintiffs seek to avoid the construction placed by this Court upon the ruling of the Supreme Court in the Missouri K. & T. case by a claim that the decision in that case should be construed to hold that the doctrine of non-justiciability it announced applies only to controversies coming within the province of the Mediation Board provided in the Railway Labor Act, and that the doctrine is without application to disputes over which the Adjustment Board has jurisdiction. In support of this position, plaintiffs cite the recent opinion of the Supreme Court in the case of Elgin, Joliet and Eastern Railway Company v. Burley, 65 S.Ct. 1282. We are unable to agree with plaintiffs that either of the opinions of the Supreme Court in the cases above referred to are subject to the construction urged. In the Missouri K. & T. case, as in the case at bar, plaintiffs were attacking an agreement made by the carrier and another union as an unlawful infringement upon the rights of the plaintiffs and as a violation of the Railway Labor Act. The Mediation Board has no general jurisdiction to determine such a controversy. The Railway Labor Act does not give the Court jurisdiction either. Holding the views here expressed on the issues presented under Count One of the complaint, we do not pass on the merits of the issue between the two unions.

In considering the record as presented on Count Two of the complaint, we note at the outset that there is no substantial disagreement between the plaintiff Telegraphers' Union and the defendant carriers. While the O.R.T. expresses some concern for the welfare of the defendant carriers, that they may be compelled by virtue of the conflicts in their contracts with the plaintiff union and the defendant union, to hire members of one or the other union for jobs where services are not needed, the defendant carriers have shown very little concern about this litigation. The defendant carriers have filed a joint answer. Representatives of the carriers attended pre-trial conferences, but took no part in them. The carriers were represented by counsel at the hearing, but offered no evidence. Representatives of carriers took no part in the trial other than to ask one or two questions of one witness. The carriers have filed no briefs in the case. In answer to Count Two of the Complaint, the carriers plead that the findings of the Railroad Adjustment Board in awards Nos. 2253 to 2258 rendered decisions vitally affecting "adverse claims of the plaintiffs to the right to perform the work in question, and that unless granted relief by this Court, plaintiffs have been and will be deprived of any such rights without full and fair hearing and a judicial determination of their rights."

By Count Two of the complaint, plaintiffs ask that defendants be permanently enjoined from enforcing or bringing any action for enforcement of the awards of the Adjustment Board in cases Nos. 2253 to 2258. These awards were made in cases initiated by defendants B. R. C. against the carriers. Each case is based upon alleged violation of the "Memorandum Agreement" entered into by the carriers with the defendants. Plaintiff was not a party to the proceedings. Plaintiff Telegraphers' Union sought to intervene in the proceedings and intervention was denied. Such denial of alleged right to be heard before the Adjustment Board in cases Nos. 2253 to 2258 is one of the grounds urged on this Court for enjoining enforcement of the awards of the Adjustment Board. No controversy between the carriers and plaintiff Telegraphers' Union was presented to the Adjustment Board. It was the plaintiffs' position at the time they sought to intervene that if the carriers were compelled to abide by the agreement they had made with the Clerks' Union, it would result in the carriers depriving the members of the plaintiff union of rights claimed by them under their contracts with the carriers. Plaintiffs' position, as they sought to inject it before the Adjustment Board, in the Clerks' cases, was the same position and issue plaintiffs set forth in Count One of their complaint in this case. The real question which plaintiffs would have tried, had they been permitted to intervene before the Adjustment Board in cases Nos. 2253 to 2258, was the limits within which collective bargaining agreements of the organizations with the carriers were effective—were the work and positions affected by the alleged overlapping of the two agreements properly within the Telegraphers' craft or the craft represented by the Clerks' Union? That this is true is evident from a brief excerpt from opinion of the Referee in Docket 2253:

"Intervention by such third persons in these claims filed by the Clerks' Organization could be of no avail. If this Board

should find in these cases that the Carrier has breached its agreement with the Clerks, there must be an award in favor of the Clerks; *the Board's sole function is the interpretation and application of the agreement. It cannot alter an agreement for the relief of either party, even though it might appear that the work was also covered by an agreement with the third parties.* If, therefore, the third parties were permitted to intervene and were able to show that the work in question was covered by their contract, that fact could not alter our award, if we found that the work was also covered by the Clerks' contract. We see no way in which this Board, *acting within its jurisdiction,* could save a carrier who has executed two agreements, the scope rule of which agreements cover the same work; nor do we believe it was the intention of the Congress in such a case to permit the employes covered by one such agreement to intervene and be heard in a claim filed before this Board by the employes covered by the other agreement." (Emphasis added)

At the threshold of plaintiffs' case under Count Two of the complaint, the question arises—did the plaintiff Telegraphers' Union have a right to intervene before the Adjustment Board in cases Nos. 2253 to 2258? Does the Railroad Adjustment Board have jurisdiction to pass upon and determine controversies between rival unions and determine the rights of such competing organizations to negotiate with employers concerning filling certain positions under collective bargaining contracts with the carriers? The title to the Railroad Adjustment Act, H.R. 9861, Public No. 442, U. S. Statutes, Volume 48, page 1185, reads as follows: "To amend the Railway Labor Act approved May 20, 1926, and to provide for the prompt disposition of disputes *between carriers and their employees."* On reading the act, it is found to be in harmony with the title, namely, its purpose is to provide for the settlement of disputes between carriers on the one hand and their employees on the other. We find no basis in the sections of the Act setting up the Adjustment Board for concluding that Congress gave to the Adjustment Board jurisdiction or power to determine disputes between rival labor organizations.

In a supplemental brief filed by plaintiffs we have been supplied with a part of the proceedings of the Congressional Committee, which occurred at the time of consideration of the Railway Labor Act. We find this comment by Commissioner Eastman, one of the authors of the Act, as to powers of the Adjustment Board:

"Well, I think that that is intended to be quite broad. These questions that come before the Adjustment Board relate to minor matters, to grievances and to interpretations of existing rules, and so on, and it would be my view that that paragraph gives the parties the opportunity to be heard in person, if they care to be heard, and by counsel, or by other representatives."

Can it be said that the conflict between the Telegraphers' and Clerks' Unions "relates to minor matters"? Can it be said that cancellation in whole or in part of the "Memorandum Agreement," the result of a strike threat, and brought about by mediation, under the same Act, is a "minor matter"? We do not so consider it. Had plaintiff union been permitted to intervene in the cases before the Adjustment Board filed by defendant union, and there litigated the jurisdictional conflict between the two unions, which is now and was then the only issue between them, and had the Adjustment Board undertaken to pass on the controversy and settle a dispute which thus far has failed to yield either to efforts of the Mediation Board, arbitration, or the decision of the American Federation of Labor, and had decided where and to what extent the jurisdiction of plaintiff union over-lapped on the jurisdiction of defendant union, or vice versa, and given an award in accord with such finding and that the collective bargaining contracts of the unions with the carriers were void to the extent they included work beyond the jurisdiction of the contracting party, it is our opinion that such an award would have been beyond the powers of the Adjustment Board and a nullity. In Bates v. Union Terminal Co., 5 Cir., 89 F.2d 768 loc. cit 770, the Court said:

"The purpose of the Railway Labor Act (45 U.S.C.A. § 151 et seq.) is to facilitate peaceful, orderly adjustment of disputes between railroads and their employees, to prevent strikes and other disturbances."

In a concurring opinion by Judge Hutcheson in this case, the following comment pertinent to the question under discussion was made:

"The amended Railway Labor Act of 1934, chapter 8, title 45 U.S.C.A. (section 151 et seq.), has for its general purpose to

avoid any interruption to commerce, and to that end it is in aid of collective bargaining. Its design, purpose and result is to make such bargaining effective. It has no regard to, it does not concern itself with, disputes between employees as such. It looks to, it deals entirely with, disputes between carriers on the one hand, and their employees on the other. * * * In a dispute before an adjustment board under the Act, the carrier stands on one side, and the employees who complain against it, appearing normally but not necessarily by their official representative, stand on the other."

In the case of Stephenson et al. v. New Orleans & N. E. R. Co. et al., 180 Miss. 147, 177 So. 509, 517, the Supreme Court of Mississippi ruled that to give the National Railroad Adjustment Board jurisdiction, it is necessary that there be a dispute submitted to it for settlement between a carrier on the one side, and its employees on the other. In this case, the dispute was between the employees of two separate carriers. The Adjustment Board took jurisdiction of the case. The Court held it was without jurisdiction—

"Congress did not empower the Adjustment Board to impair the obligations of an existing contract or to disturb the harmonious relations existing between a carrier and its employees. * * * One of the purposes of the act is defined to be 'to avoid any interruption to commerce or to the operation of any carrier engaged therein' (section 2 (45 U.S.C.A. § 151a)), and the very title of the act itself sets forth the only purpose thereof as being 'to amend the Railway Labor Act approved May 20, 1926, and to provide for the prompt disposition of disputes between carriers and their employees.' 48 Stat. 1185. And, in our opinion, it embraces only disputes between a carrier on the one hand, and the employees on the other. Therefore, we have reached the conclusion that the Adjustment Board was wholly without jurisdiction of the subject-matter of this dispute between an employee of one carrier and the employees of another separate and distinct carrier, and that the award, which is plead as a defense in the present case to the right of the appellants to enforce a recognition of their seniority rights as train dispatchers of the appellee carrier, is an absolute nullity."

The Adjustment Board, in its opinion in Docket 2253, recognized its lack of jurisdiction over the dispute which plaintiff and the carrier tried to get before it.

■ We are unable to find any authority, and we have not been cited to any, in support of the proposition that the National Railroad Adjustment Board has power to pass upon and determine jurisdictional controversies between rival unions and abrogate, in whole or in part, collective bargaining agreements between unions and carriers. By the Act, its jurisdiction is confined, U. S. Statutes, Volume 48, pages 1189, 1191, Section 3 subd. First (i), 45 U.S.C.A. § 153, subd. First (i), to "disputes between an employee or group of employees" on the one hand, "and a carrier or carriers" on the other, "growing out of grievances or out of the interpretation or application of agreements concerning rates of pay, rules, or working conditions * * *." Plaintiffs' interest in the cases filed before the Adjustment Board by the Clerks' Union is well stated in the Referee's opinion in Docket 2253—

"There can be no serious question but that the Third Division has jurisdiction of the subject matter of these eleven claims now under consideration. Nor can there be any question that we have jurisdiction of the person both of the claimant and the Carrier. *It is equally clear that we do not have jurisdiction of the person of the third parties who may be indirectly affected by an award in these claims. It follows that no award made in these claims could be binding on such third parties.* It does not follow from that, however, that an award against the Carrier over the person of which we do have jurisdiction, would not be valid and binding on the Carrier."

■ Having reached the conclusion that the Railroad Adjustment Board was correct in its ruling, refusing to permit the plaintiff Telegraphers' Union to intervene in the hearing and disposition of the cases before that Board filed by the defendant Clerks' Union against the carriers, we hold that plaintiffs are not in a position to complain as to the procedure before that Board and disposition of those cases.

■ The defendant carriers have raised no question in this case of irregularity of procedure of the Adjustment Board. The defendant carriers are not in a position to use this trial to pass upon the legality of the decisions of the Railroad Adjustment Board in cases Nos. 2253 to 2258, for the reason that they were the losing parties

in those awards. Those awards do not become final until confirmed by a United States District Court, and should the Clerks' Union take steps to have the awards confirmed, defendant carriers may be heard on objections, if any they have, to the awards or either of them, before the United States District Court in the proceeding seeking confirmation of the awards. Such is the procedure provided by the statute. U.S.C.A. Title 45, Section 153, subd. First (p).

Plaintiffs' complaint will be dismissed.